## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

     vs.                                   Case Nos. 17-CR-2486,
                                                   18-CR-930, 18-CR-931

CHASE SMOTHERMON,

       Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** is before the Court on the sentencing of Defendant Chase Smothermon in case numbers 17-CR-2486, 18-CR-930, and 18-CR-931.  The parties agreed to a total sentence of 40 to 60 years of imprisonment across the three cases as part of Mr. Smothermon's Rule 11(c)(1)(C) plea agreement in 18-CR-930.  *See* Doc. 223 at 6 in 18-CR-930.  The Court then held Mr. Smothermon's sentencing hearing on August 26, 27, and 28, 2020.  Over the course of the hearing, it heard testimony from six witnesses: Dr. Simone Viljoen, Dr. David Lisak, Rev. Travis Rollins, and Crystal Banks for the defense; and Federal Bureau of Investigations (FBI) Special Agent (SA) Leysha Lopez-Recci and Dr. Renee Sorrentino for the government.  *See* Docs. 327, 328, and 331 in 18-CR-930.  The Court also heard victim impact statements from four family members of victim J.S., argument by the parties, and allocution by Mr. Smothermon.  Doc. 331 at 2.  After carefully considering all of the evidence presented as well as the sentencing factors set forth in 18 U.S.C. § 3553(a), the Court accepted the Rule 11(c)(1)(C) plea agreement and sentenced Mr. Smothermon to 45 years of imprisonment in 18-CR-930, 20 years of imprisonment in 18-CR-931, and 10 years of imprisonment in 17-CR-2486, to run concurrently.  *See* Doc. 331 at 1 in 18-CR-930; Doc. 136 at 1 in 18-CR-931; and Doc. 80 at 1 in 17-CR-02486.[1]

---

[1] The Court announced the specific sentence for each count of conviction, as well as Mr. Smothermon's

Although the Court gave a detailed explanation of its sentences at the August 28 hearing, it omitted the discussion of Mr. Smothermon's offense conduct in the interest of time.  The Court will accordingly provide its full sentencing analysis under the § 3553(a) factors in this memorandum opinion and order.  The information referenced herein comes from a number of sources, including the Presentence Investigation Reports (PSRs) in each of Mr. Smothermon's three cases, the exhibits submitted by the parties, and the testimony presented at the three-day sentencing hearing.

## DISCUSSION

Chase Smothermon is before the Court in case numbers 17-CR-2486, 18-CR-930, and 18-CR-931.  Pursuant to *United States v. Booker*, 543 U.S. 220 (2005), this Court must consider the advisory United States Sentencing Guidelines as well as each of the additional factors stated in 18 U.S.C. § 3553(a) in imposing a reasonable sentence that is sufficient, but not greater than necessary, to comply with the purposes set forth in that section.

In 17-CR-2486, Mr. Smothermon pled guilty to Count 1 of a one-count indictment charging him with Distribution of 50 Grams and More of Methamphetamine and Aiding and Abetting, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1) and (b)(1)(A).  Doc. 56 at 2 in 17-CR-2486.

In 18-CR-930, he pled guilty to Counts 1 and 3 of a three-count second superseding indictment charging him with Conspiracy to Kidnap, in violation of 18 U.S.C. § 1201(c), and Kidnapping, in violation of 18 U.S.C. § 1201(a)(1).  Doc. 223 at 2 in 18-CR-930.

And in 18-CR-931, he pled guilty to Counts 1–6 of a six-count indictment charging him with Conspiracy to Distribute Marijuana and Cocaine, in violation of 21 U.S.C. § 846; Possession

conditions of supervised release, at the sentencing hearing.  That information will also be included in the criminal judgments that are forthcoming in each of his three cases.  The Court additionally entered a 36-page written order ruling on all of Mr. Smothermon's legal and factual objections.  *See* Doc. 79 in 17-CR-2486, Doc. 329 in 18-CR-930, and Doc. 135 in 18-CR-931.  The Court will not repeat that analysis here.

with Intent to Distribute Marijuana and Aiding and Abetting, in violation of 18 U.S.C § 2 and 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); Possession with Intent to Distribute Cocaine and Aiding and Abetting, in violation of 18 U.S.C § 2 and 21 U.S.C. §§ 841(a)(1) and (b)(1)(D); Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c); and Felon in Possession of a Firearm and Ammunition, in violation of 18 U.S.C. § 922(g)(1).  Doc. 82 at 2 in 18-CR-931.  Mr. Smothermon accepts responsibility.

The United States Probation Office prepared a Presentence Investigation Report (PSR) in each of the three cases. The Court adopts the PSRs' factual findings with the exception of its rulings on the factual objections raised by Mr. Smothermon, as set forth in the Court's Sealed Order on Defendant Chase Smothermon's Objections.  *See* Doc. 79 in 17-CR-2486, Doc. 329 in 18-CR-930, and Doc. 135 in 18-CR-931.

In 17-CR-2486, Mr. Smothermon's Total Offense Level is **29**, and his Criminal History Category is **III**.  The statutorily authorized minimum sentence is 120 months.  The advisory Guidelines imprisonment range for this conviction is therefore **120-135 months**.

In 18-CR-930, Mr. Smothermon's Total Offense Level is **43**, and his Criminal History Category is **III**.  The advisory Guidelines imprisonment range for this conviction is therefore **life imprisonment**.

In 18-CR-931, Mr. Smothermon's Total Offense Level is **42**, and his Criminal History Category is **II**.[2]  The advisory Guidelines imprisonment range for this conviction is therefore **360 months to life**.  However, for Count 5, the advisory Guidelines imprisonment range is the minimum statutory term of imprisonment of **60 months**, to run consecutive to all other counts.

---

[2] Mr. Smothermon's Criminal History Category is one level lower in 18-CR-931 than in his other two cases because his convictions in 17-CR-2486 and 18-CR-930 count as expanded relevant conduct not eligible for criminal history points in 18-CR-931.  *See* Doc. 125 at ¶¶ 53–54 (citing U.S.S.G. §§ 1B1.3(a)(1)(A) and (a)(2)).

Mr. Smothermon entered into a Rule 11(c)(1)(C) plea agreement in 18-CR-930 which specifies that a sentence of **not less than 40 years and not more than 60 years of imprisonment** is the appropriate disposition in all 3 cases. *See* Doc. 223 in 18-CR-930. The Court accepts the agreement and is accordingly bound by its stipulated sentencing range. Fed. R. Crim. P. 11(c)(1)(C).

In addition to the Sentencing Guidelines, this Court also considers the other factors set forth in 18 U.S.C. § 3553(a). This section requires the Court to consider the nature and circumstances of the offense and the history and characteristics of Mr. Smothermon. It also requires the Court to impose a sentence that complies with the purposes of sentencing, which include (1) retribution, (2) deterrence, (3) incapacitation, and (4) rehabilitation. In satisfying these purposes, the Court is obligated to consider each of the factors outlined in § 3553(a). The Court has considered each of those factors.

**As to the nature and circumstances of the offenses:**

<u>17-CR-2486</u>

In October 2016, Pecos Valley Drug Task Force Officers (TFOs) initiated an investigation into narcotics trafficking at the residence at 910 Sandia in Carlsbad, New Mexico. The TFOs identified Vanna Eaton as a methamphetamine dealer working out of the 910 Sandia address. During the investigation, the TFOs utilized a Confidential Informant (CI) to arrange the purchase of two ounces of methamphetamine from Ms. Eaton.

On October 18, 2016, the CI arrived at the 910 Sandia residence. The CI was equipped with audio and video recording devices which captured the encounter. The TFOs also conducted surveillance on the home during the CI's contact. At the residence, the CI made contact with Ms. Eaton and her supplier, later identified as Chase Smothermon. Drug laboratory reports confirmed

the total weight of the methamphetamine sold by Mr. Smothermon was 54.22 grams of methamphetamine (actual).

On October 27, 2016, the CI arranged the purchase of two ounces of methamphetamine and a quarter ounce of heroin from Mr. Smothermon.  In addition, Ms. Eaton and other distributors were planning to receive a pound of methamphetamine, psychedelic mushrooms, and additional heroin from Mr. Smothermon.  The October 27 transaction never took place.  However, on October 29, 2016, the CI met with Mr. Smothermon and observed him to be in possession of two pounds of methamphetamine and an ounce of heroin.  Mr. Smothermon "fronted" the CI 15 grams of methamphetamine, four ecstasy pills, and five grams of mushrooms.  The CI later paid Mr. Smothermon $540 for the substances he provided up front.

Mr. Smothermon was again scheduled to bring two pounds of methamphetamine to distributors in Carlsbad on November 2, 2016.  No further information was provided regarding the November 2, 2016 transaction.

In summary, Mr. Smothermon lived in Albuquerque and would frequently travel to Carlsbad to deliver methamphetamine and other controlled substances.  On October 18, 2016, Mr. Smothermon sold 54.22 grams of methamphetamine (actual) to an individual cooperating with law enforcement.

<u>18-CR-930</u>

On or about August 5, 2017, Mr. Smothermon and Mariah Ferry, who was one of Mr. Smothermon's girlfriends, discovered that their Albuquerque residence had been burglarized and money and marijuana had been stolen.  Mr. Smothermon enlisted the assistance of Jose Torrez to identify the culprits.  Based on information provided by Torrez, Mr. Smothermon and Ms. Ferry believed that two individuals, J.S. and M.T., were responsible for the theft.  At the time, J.S. was

living in Torrez's garage in Albuquerque.  J.S. was a good friend of Mr. Smothermon, and M.T. was good friends with J.S.

Mr. Smothermon asked Mr. Torrez to inform him if M.T. and J.S. returned to Mr. Torrez's garage, because Mr. Smothermon sought to inflict significant bodily harm on J.S. and M.T. in order to teach them a lesson about stealing from him, while also intending to recover his drugs and money.  Mr. Torrez, who was aware of Mr. Smothermon's intentions, agreed to let Mr. Smothermon know when J.S. and M.T. returned.  Mr. Smothermon compensated Mr. Torrez for his assistance.

In the early morning hours of August 8, 2017, Mr. Torrez alerted Mr. Smothermon that J.S. was home.  Mr. Smothermon and Ms. Ferry drove to Mr. Torrez's house in Ms. Ferry's car where they confronted J.S. and assaulted him using blunt objects.  Ms. Ferry struck J.S. with an object, possibly the butt of a gun.  Mr. Smothermon struck J.S. multiple times in the head.  The beating continued until Mr. Torrez intervened and told Mr. Smothermon to remove J.S. from his property. J.S., who was bloodied and badly beaten, was loaded into the trunk of Ms. Ferry's car.  J.S. was alive at this point, but his hands, ankles, and mouth were bound with tape.

Ms. Ferry and Mr. Smothermon drove to a section of land in Albuquerque adjacent to the home of Mitchell Overhand, an acquaintance of Mr. Smothermon, in order to enlist Mr. Overhand's assistance.  At that location, they proceeded to use Ms. Ferry's iPhone to videotape J.S.'s continued assault, death, and post-mortem mutilation.  Specifically, a 36-second video taken at 6:13 a.m. depicts J.S. in the trunk of Ms. Ferry's car.  He appears severely beaten, his ankles are bound with duct tape, and he is gasping for breath and moaning.  Ms. Ferry asks, "Where is it?" while she strikes his knees with the back of a hatchet several times.  J.S. moans in response.

J.S. died in the back of Ms. Ferry's trunk.  Video evidence shows that Mr. Smothermon and Ms. Ferry then mutilated and dismembered J.S.'s body in a shed on Mr. Overhand's property in the early morning of August 8, 2017.  Specifically, video from 7:09 a.m. shows Ms. Ferry and Mr. Smothermon working together to sever J.S.'s penis.  After severing J.S.'s penis, Mr. Smothermon inserts J.S.'s penis into the portion of J.S.'s throat that had been cut open by Ms. Ferry in an earlier video.  As he does so, Mr. Smothermon says, "Teach you to ruin our vacation." Ms. Ferry then says, "A dick in your throat," and giggles.  Video from 7:11 a.m. shows J.S. with his penis in his mouth.  Mr. Smothermon states, "You got your own dick in your mouth."  Mr. Smothermon asks Ms. Ferry what she wants to do next, and Ms. Ferry responds that she wants to cut his eyes out.  Mr. Smothermon then repositions J.S.'s head, focusing on an incision above the right eye, and states "What, did you hit him right there with the hatchet, you did, huh?" Ms. Ferry responds, "Oh, Yeah."

Ms. Ferry begins to cut out J.S.'s right eye.  She then uses a machete to repeatedly hack J.S.'s chest, creating a large open wound the length of his torso.  As Ms. Ferry strikes his chest with the machete, Mr. Smothermon says, "Get it girl," and "That's it, open him up. Good job." Toward the end of the video, Mr. Smothermon says, "You haven't bonded until you chopped someone up with your significant other."  Ms. Ferry giggles in response.  Finally, a video from 7:14 a.m. shows Ms. Ferry continuing to hack at J.S.'s chest.  She states, "motherfuckin," then places her foot on J.S.'s chest for leverage while she stabs his chest repeatedly.  As she does so, blood is pushed out through the open gash on J.S.'s throat from where Ms. Ferry had cut it.  During this video, Mr. Smothermon encourages Ferry by stating, "Stab it. Push it down deep… Good job." A later photograph shows that J.S.'s nipples were cut off and placed over his eye sockets.  At 8:06

a.m., Ms. Ferry's iPhone was used to make the following internet queries: "best way to decompose flesh and bone," and "how to rot down dead bodies: the Tet Zoo Body farm."

Several hours later, Mr. Overhand's girlfriend Corrinn Robertson saw the blood in the shed and offered to clean up the blood. Together, Mr. Smothermon, Ms. Ferry, Mr. Overhand, and Ms. Robertson cleaned up the shed where J.S. was mutilated.

After J.S. was killed, Mr. Smothermon and Ms. Ferry returned to the home of Jose Torrez. There, the group came up with a plan to cover up their crime by cleaning the crime scenes and getting rid of evidence. Mr. Torrez then cleaned up the garage on his property where J.S. was assaulted and abducted.

Later that same day on August 8, 2017, Mr. Smothermon lured M.T. to his home under the guise that Mr. Smothermon wanted to purchase marijuana. Mr. Smothermon intended to inflict bodily harm on M.T. and recover his drugs. M.T., who was unaware of J.S.'s kidnapping and murder, drove to the house where Mr. Smothermon resided with Ms. Ferry.

Immediately upon entering Smothermon's house M.T. was assaulted, bound, gagged, and tortured for hours by Mr. Smothermon, Ms. Ferry, and others, in an effort to determine if M.T. and J.S. had stolen Mr. Smothermon's marijuana. During the ordeal, while bound and gagged, M.T. was shown a photo of a deceased J.S. lying on a blue tarp, surrounded by blood, with his severed penis in his mouth. The group threatened to do the same to M.T. unless he produced the stolen drugs. Specifically, at one point, Ms. Ferry held garden sheers in her hand and Mr. Smothermon threatened to harm M.T., just as they had done to J.S. Again, Ms. Ferry and Mr. Smothermon took pictures and videos to document their crimes.

Mr. Overhand, who was present during the ongoing assault and torture of M.T., eventually put an end to the assault. At Mr. Overhand's request, Ms. Robertson came to Mr. Smothermon's

home, and she also observed M.T. to be badly beaten and bound.  Mr. Overhand then drove M.T.'s truck, with M.T. still bound in the passenger seat, to Ms. Robertson's residence while Ms. Robertson followed in another vehicle.  Once at Ms. Robertson's home, Ms. Robertson wiped down M.T.'s truck.  Ms. Robertson and Mr. Overhand then supplied M.T. with drugs, alcohol, and food in the hopes of calming him down so he would not go to the police.  M.T. was forced to stay there overnight, but was released the next morning, on August 9, 2017, without further physical harm.

That same day, M.T. was admitted to the Lovelace Medical Emergency Room presenting with injuries due to an assault with a blunt object.  He complained of right knee pain and reported being kicked and punched multiple times, including injury to the head.  He reported a brief loss of consciousness, and two instances of vomiting.  He was treated for contusions on his face, forearm, and knee, a concussion, and post-traumatic headache. A CT scan revealed a left nasal bone fracture, but no internal brain abnormality.  He was prescribed narcotic analgesic (pain) medication and discharged on the same date with instructions for caring for abrasions and a concussion.

Later in the evening of August 9, 2017, Mr. Smothermon, Ms. Ferry, and others conspired to clean up the garage where J.S. was kidnapped, Smothermon's residence where M.T. was kidnapped, and the shed where J.S. was mutilated.  Some co-conspirators were paid with drugs for their participation.

That same evening, Ms. Robertson drove Mr. Overhand to a Rio Rancho gas station, where Mr. Overhand met up with Mr. Smothermon and Ms. Ferry.  Ms. Ferry, Mr. Smothermon, and Mr. Overhand then traveled in Mr. Smothermon's pickup truck, with J.S.'s body in the back, and buried J.S. in a shallow grave in the West Mesa desert, near the Rio Puerco.  Ms. Robertson waited behind

to act as a lookout.  J.S.'s body, wrapped in a blue tarp, was later recovered by the Albuquerque

Police Department (APD) from a shallow grave in the desert on September 18, 2017.

M.T. did not go to the police until three days after his release, after which the APD launched

an investigation into M.T's kidnapping and J.S.'s disappearance and murder.  On August 12, 2017

M.T. went to the police and reported he had been kidnapped, and an officer observed that he was

badly beaten with several swollen limbs, scratches on his left arm, and contusions on the back of

his head.  He stated that he had already gone to the hospital.  He stated that he was very scared and

was crying during the interview.  He reported that on August 8, 2017, he had received a text

message from Mr. Smothermon asking for some marijuana, which M.T. agreed to deliver to Mr.

Smothermon's residence.  Upon arriving at Mr. Smothermon's residence, M.T. was struck in the

back of the head with a blunt object, which M.T. believed was a baseball bat.  While on the ground,

M.T. was continuously hit with blunt objects as well as punched and kicked.  M.T. was then picked

up and bound by his hands and feet with duct tape.  M.T.'s hands were taped to the front of him

and his feet were bound by his ankles.  M.T. stated he was able to observe the individuals in the

room, and he identified them as Mr. Smothermon, Mariah Ferry, Mitchell Overhand, and two other

unidentified males.

M.T. advised when he was being beaten, he was mainly being watched by Ms. Ferry.  When

M.T. would attempt to get up, she would beat M.T. with a stick or a baseball bat.  M.T. stated the

beating went on for several hours.  During the beating, Mr. Smothermon would yell at M.T. that

he owed him $2,500 worth of drug money.  After several hours, M.T. was dragged into another

room where there was a television.  M.T.'s head was forcibly held up to view the television, where

M.T. described seeing J.S.'s body lying in the back of a truck.  J.S.'s severed penis was in his

mouth and there was blood all around his body.  M.T. began to cry and scream, and all the

individuals started to beat him again.  They then placed a gag device into M.T.'s mouth so he would stop crying and then left M.T. to stare at the picture of J.S.  During this time, M.T. was told he was going to be killed because he was a "loose end."  His family was also threatened.  M.T. stated he continued to be beaten and Mr. Smothermon would pour rubbing alcohol on M.T.'s open wounds causing them to burn.

M.T. stated he kept pleading to Mr. Smothermon and the others that he did not know anything about the money.  At this point, Mitchell Overhand yelled "Stop, I believe him."  Mr. Overhand then made everyone stop beating M.T., and Mitchell's girlfriend, Corrinn Robertson, arrived at the residence.  Mr. Overhand helped M.T. to his feet but kept him bound.  Mr. Overhand walked M.T. outside and forced him into M.T.'s vehicle.  Mr. Overhand then drove to Ms. Robertson's townhouse in Northeast Albuquerque.  M.T. noticed Ms. Robertson was following them in a vehicle that had been owned by J.S.

Once they arrived at the townhouse, Mr. Overhand forced M.T. out of the car and into the home.  M.T. was offered pizza and beer, but stated he just wanted to leave.  M.T. was still bound at this point and Mr. Overhand forced M.T. to eat the food.  M.T. indicated Mr. Overhand went upstairs with Ms. Robertson and he heard them having sex.  The couple then came back down the stairs and injected a drug into their arms, which M.T. believed to be methamphetamine.  M.T. stated Mr. Overhand subsequently forced him back into his vehicle and drove him to an empty lot near Alameda and Edith Road.  Mr. Overhand then wiped down the vehicle with a rag and rubbing alcohol.  Mr. Overhand told M.T., "You have been spared. Don't talk to the cops."  He then cut M.T. free from the duct tape and told M.T. to leave.  M.T. got into his vehicle and initially drove home before going to the hospital.

An APD Crime Scene Specialist photographed M.T.'s injuries and text messages from Mr. Smothermon to M.T.  In the conversation, Mr. Smothermon continued to threaten M.T. and his family following the kidnapping.  Text messages reflect that Mr. Smothermon made statements including "you were the only loose end I needed to tie up," and "I'll say hello to your mother for ya."

On August 15, 2017, M.T., was interviewed by APD a second time.  M.T. elaborated that he was beaten in the dining room and kitchen area of Smothermon's residence.  M.T. stated that while he was being beaten and tortured, he started rubbing his head along the wall because an unknown female was cleaning the blood on the concrete floor so there would be no evidence on the floor.  M.T. later identified Ms. Ferry as the unknown female.  M.T. clarified the picture he saw of J.S. was not on a television but on a computer screen in the dining area.  M.T. reported that Mr. Smothermon told him "Look what we had to do to Skinny."  Skinny is J.S.'s nickname.  Mr. Smothermon also stated, "Skinny went out with three whacks."  M.T. stated Ms. Ferry was also standing over him with a gardening tool used to cut tree branches and threatened to cut off M.T.'s penis and fingers.  Mr. Smothermon advised M.T. that Ms. Ferry did it to Skinny, and she would do the same to M.T.

On August 19, 2017, Mitchell Overhand was taken into custody and interviewed by APD detectives.  He reported that Mr. Smothermon was robbed and believed that "Skinny John" was selling marijuana that seemed like Mr. Smothermon's marijuana.  Mr. Overhand confirmed J.S. was living in Torrez's garage, and that APD had recently raided Torrez's house.

Mr. Overhand stated that he was contacted by Mr. Smothermon, who told him he had a body in a trunk and that it was "Skinny."  Mr. Overhand further said Mr. Smothermon and Ms. Ferry were all "amped up," and the body was in the trunk of Ms. Ferry's car.  Mr. Overhand

indicated there was "blood and smell."  He later learned they had moved the body from Ms. Ferry's car to Mr. Smothermon's truck.

On August 16, 2017 APD detectives obtained an arrest warrant for Mr. Smothermon for local charges related to the instant offense.  Detectives began surveilling Mr. Smothermon's residence at Atrisco Ranch Road.  During surveillance, detectives observed two men enter the residence and appear to box items inside and place them into a truck.  A traffic stop was conducted on the truck as it left the residence, and the driver advised that Mr. Smothermon had asked him to remove items from the residence and take them to Mr. Smothermon at the Staybridge Suites hotel in Albuquerque, room 401.

On August 17, 2018, APD arrested Mr. Smothermon at the Staybridge Suites, where Mr. Smothermon was staying with Mariah Ferry and Cheriee Allaway (another of Mr. Smothermon's girlfriends).  The hotel room had been rented and paid for by Ms. Allaway using a fictitious Ohio address.  Inside the hotel room, law enforcement located approximately 78 grams of cocaine, 1.22 grams of ketamine, 4.8 kilograms of marijuana, a total of $7,616.25, and nine firearms.

Inside the hotel room, law enforcement also recovered J.S.'s backpack, which contained J.S.'s laptop computer, wallet, driver's license and other forms of identification.  Although Ms. Ferry and Ms. Allaway were present in the hotel room, they were not arrested at that time.  Mr. Smothermon and Ms. Allaway were later charged as a result of the drugs and guns seized from the hotel.

On August 18, 2017, Mariah Ferry's vehicle was recovered at Mitchell Overhand's residence.  Law enforcement located blood and maggots in the trunk of the vehicle.  On August 19, 2017, Mr. Smothermon's pickup truck was seized.  Numerous items of evidentiary value were found in the pickup, including J.S.'s phone and blood evidence.  DNA evidence also revealed that

a man's athletic shoe found in the bed of the pickup truck was worn by Mr. Smothermon and had M.T.'s blood on it.  Similarly, DNA evidence reflects that a pair of women's pants worn by Ms. Ferry had M.T.'s blood on them.  A subsequent search of Mr. Smothermon's residence revealed an additional 3.4 kilograms of marijuana.

Mr. Smothermon was interviewed by APD homicide detectives on August 17, 2017.  He initially maintained the lie that he did not know what happened to J.S.  He then attempted to falsely implicate Mitchell Overhand, while continuing to claim that he did not know what happened to J.S. and denying his involvement in crimes against M.T.  For example, Mr. Smothermon claimed that one night at 4 a.m., Mr. Overhand woke him up, told him where J.S. was, and drove him to Torrez's garage where Mr. Smothermon punched J.S. a few times.  Mr. Smothermon claimed that Mr. Overhand then intervened and told Mr. Smothermon to leave, and Smothermon left and walked home, leaving Mr. Overhand with J.S.  Mr. Smothermon claimed he had not seen J.S. since.  When detectives confronted Mr. Smothermon with evidence to the contrary, he doubled down on his story, saying things such as:

- "I've had a couple phone calls from [Overhand], um, asking me to make sure I keep my fucking mouth shut…"

- "I, I have already told [Overhand] too, several times, look, man, I don't know what the fuck happened, but I'm not gonna fuckin' go to jail for your bullshit…"

- "[Overhand]'s had problems with John, like I said, for several, several months…"

Mariah Ferry was interviewed multiple times by both APD and the FBI, and she gave multiple conflicting versions of events in which she minimized her own culpability.  Her statements are not summarized here for brevity, as the Court has already ruled at Ms. Ferry's sentencing that her statements were unreliable.

On August 30, 2017, APD SWAT executed a search warrant at the residence of Jose Torrez in Albuquerque.  Mr. Torrez agreed to provide a statement.  He stated that Mr. Smothermon asked him to find out who robbed his house.  Mr. Torrez found out that it was M.T. and J.S.  Mr. Torrez said that M.T. and J.S. are always together, so if one was responsible, they were both responsible, and he advised that M.T. showed up at his house and sold him $1,000 worth of marijuana for $100. Mr. Torrez recognized the marijuana as Mr. Smothermon's, and notified Mr. Smothermon of that information.  Mr. Smothermon then gave Mr. Torrez $1,400 and told him it was to "buy dope." Mr. Smothermon asked Mr. Torrez to let him know when J.S. returned to Mr. Torrez's house.

When J.S. returned, Mr. Torrez called Mr. Smothermon and told him J.S. was in the garage. Mr. Torrez reported that Mr. Smothermon asked him if he should kill J.S., and Mr. Torrez told him "no, not over weed."  Mr. Smothermon and Ms. Ferry showed up and Mr. Torrez went to his room.  Mr. Torrez heard yelling and screaming and looked at the video monitor.  He saw Ms. Ferry back her car up into the garage.  Mr. Torrez went into the garage and saw J.S. standing in the garage with blood coming from his head.  Mr. Torrez said J.S. asked for his help, but Mr. Torrez turned his back to him and observed Mr. Smothermon holding a baseball bat.  Ms. Ferry was also present inside the garage.  Mr. Smothermon then took J.S. by the back of the shoulder area or collar of his shirt and guided him to the trunk of Ms. Ferry's car.  Mr. Torrez could hear J.S. yelling and screaming down the street as they drove away.

The next day, Mr. Smothermon told Mr. Torrez that J.S. had "expired."  Mr. Torrez stated that Mr. Smothermon reported he left Ms. Ferry alone with J.S., and when Mr. Smothermon returned, Ms. Ferry was on top of J.S. with a hatchet, skinning his head.

Mr. Torrez stated he cleaned up the blood in the garage with bleach and muriatic acid.  He also buried bloody evidence outside the garage in a shallow hole in the ground.  Mr. Torrez said

he stopped cleaning the shed when he learned J.S. was dead because he thought he was only cleaning up an "ass kicking," not a murder.

Mr. Torrez was interviewed for a second time on May 31, 3018, and this second interview was conducted by the FBI.  He largely reiterated what he had told APD on August 30, 2017, but he also added that he had observed Ferry strike J.S. in his garage with what appeared to be the butt of a gun.  As she struck J.S., she stated something along the lines of "you ruined my fucking vacation."

On September 12, 2017, APD Detectives arrested Ms. Allaway in reference to an arrest warrant related to a Bernalillo County case and the charge of Harboring or Aiding a Felon.  Detectives learned that Mr. Smothermon contacted Ms. Allaway through recorded jail calls and Ms. Allaway agreed to forward information related to the kidnapping of M.T. and the ongoing missing persons investigation of J.S. to Mariah Ferry, with instructions on what to tell investigating officers.  In a separate recorded jail call, Ms. Ferry is heard telling Mr. Smothermon that she will contact Ms. Allaway regarding the information of what to say about the case.

On September 18, 2017, the body of victim J.S., wrapped in a blue tarp, was recovered by APD from a shallow grave in a rural desert mesa near the Rio Puerco outside of Albuquerque.  The body had undergone severe decomposition.  The Office of the Medical Investigator (OMI) Death Investigation Summary reflects the cause of death to be blunt force injury of the head and incised wound of the neck.  Extensive blunt force trauma and laceration wounds were reported among the entire body.  Excisional wounds of the nipples and the penis were present, and the penis was severed from the body.  Multiple fractured bones were detected throughout the body.

Although the body had undergone severe decomposition, the injuries to J.S. were consistent with the video evidence.  The original OMI report was conducted without the benefit of the video

evidence.  After the video evidence was recovered, FBI provided the video evidence to the OMI. The OMI subsequently revised the cause of death to be attributed only to blunt force injury of the head.  Upon review of the video evidence, the OMI concluded that J.S. was likely deceased at the time Smothermon and Ferry sliced J.S.'s throat open (incised wound to the neck).

<u>18-CR-931</u>

On August 16, 2017 APD detectives obtained an arrest warrant for Mr. Smothermon related to the kidnapping of M.T.  Detectives learned that Mr. Smothermon was staying in room number 401 of the Staybridge Suites.  Detectives contacted him inside the room and took him into custody. Ms. Allaway and Ms. Ferry were also located inside the room.

At the time of his arrest, Mr. Smothermon had $1,020.00 in U.S. currency on his person. Inside the room, detectives located three sandwich-size baggies containing a white powdery substance, later determined to be cocaine, hidden inside a trashcan in the bathroom.  This substance was later tested and had net weight of 78.811 grams.  Inside the freezer, detectives located a plastic baggie containing a white crystalline substance later determined to be ketamine.  This substance was tested and had a net weight of 1.228 grams.

Several baggies and containers containing marijuana were also located in the room alongside several firearms.  Agents found that the amount of cocaine and marijuana seized from the room is consistent with drug trafficking activity.  The amount of drugs, combined with the manner in which the cocaine was packaged, a digital scale, and a large amount of U.S. currency, supports that Mr. Smothermon and Ms. Allaway possessed the cocaine, ketamine, and marijuana with the intent to distribute it.

The detectives located the following amounts of marijuana in the Staybridge Suites room 401:

- 13.15 net grams in a small baggie located in a purse on the south side of the bed, a quart sized baggie in the northeast corner of the bedroom, and a finger portion of a glove located in a popcorn bag on the bathroom sink counter;

- 64 net grams in a large bag north of the television in the living room;

- 1,578 net grams in four large bags and one small baggie located under the bed;

- 3,089 net grams of pieces of marijuana plants located in a blue container at the south end of the living room; and

- 127 net grams located in a black bag in the kitchen.

The detectives also located the following nine firearms in addition to several rounds of ammunition in the Staybridge Suites room 401:

- Colt U.S. Army model 1917 .45 caliber revolver, located in a wooden box in the living room;

- Colt Mustang XSP model .380 Auto caliber pistol, located in a pink bag belonging to Allaway;

- Ruger model 22/45 Lite .22LR caliber pistol, located in a wooden box in the living room;

- Marlin model 60 .22LR caliber rifle, located in a gray comforter in the living room;

- Marlin model 60W .22LR caliber rifle, located in a gray comforter in the living room;

- Gaucha – I.G.A. .410-gauge shotgun, located in a gray comforter in the living room;

- Ruger model P95 9mm caliber handgun, located in a pink bag belonging to Ms. Allaway;

- FN Browning 9mm handgun; and

- Allen and Thunder muzzle loader handgun, unknown caliber.

The detectives further noted that Mr. Smothermon had been previously convicted of Aggravated Burglary, a felony offense, and he was therefore restricted from possessing firearms or ammunition.

The detectives also located a backpack inside the hotel room containing property belonging to J.S.  They seized three cell phones belonging to Ms. Ferry, Mr. Smothermon, and Ms. Allaway. They also located several items of equipment later determined to be used in the making of THC wax.  The detectives also located $6,596.25 in U.S. currency in a shoulder bag belonging to Ms. Allaway.  Ms. Allaway reported that this cash was provided to her by her father to facilitate a car payment, reinvest in her business, and to help in her care of her grandparents.  The detectives found $1,020.00 in U.S. currency on Mr. Smothermon's person.

Detectives then executed a search warrant at Mr. Smothermon's residence and located more marijuana in addition to several marijuana plants.  They also located evidence related to the kidnapping of M.T., including bloodstains on the walls.  The detectives located the following amounts of marijuana at Mr. Smothermon's residence:

- 2,628 net grams of marijuana plants in the backyard;

- 187 net grams in a bag on the kitchen counter;

- 94.3 net grams on a table north of the refrigerator;

- 449 net grams in a cardboard box in the living room; and

- 125 net grams in the bedroom south of the master bedroom.

On August 29, 2017 detectives executed a search warrant of a black 1994 Ford belonging to Enrico Montoya.  Inside the vehicle, they located 26.1 net grams of marijuana in a plastic bottle on the middle console.  Mr. Smothermon had enlisted Montoya to move his effects from his Atrisco Ranch address to the Staybridge Suites hotel.

On September 13, 2017, detectives executed a search warrant on Ms. Allaway's vehicle, a Red Honda Fit.  This search of Ms. Allaway's vehicle resulted in the discovery of a small amount of marijuana.  The marijuana was tested and resulted in a net weight of 4.43 grams.

On October 16, 2017, agents executed a search warrant on Ms. Allaway's cellular phone, previously located during the search of Staybridge Suites room 401 on August 17, 2017.  The phone contained numerous text messages between Ms. Allaway and other individuals which involved the negotiation and sale of amounts of marijuana and pills.

Offense behavior not part of relevant conduct:

On August 24, 2017, APD detectives obtained a search warrant for a cellphone possessed by Chase Smothermon.  During execution of the search warrant, APD discovered evidence that the Court has considered but will not identify or elaborate on, as it is not charged conduct.

**As to the history and characteristics of Mr. Smothermon:** He is 32 years old.  He was born to Chris Allen Smothermon and Charlotte Darlene Anderson.  His parents separated when he was preschool age.  His father lived in Broken Arrow, Oklahoma and his mother lived in Austin, Texas.  Mr. Smothermon moved back and forth between his parents frequently during his childhood, which was plagued by severe neglect and physical, sexual, and emotional abuse.

Mr. Smothermon's parents, Chris and Charlotte, had a very troubled relationship before Mr. Smothermon was born.  Charlotte had struggled with mental illness her whole life and reported that she was sexually assaulted by different male relatives, beginning at age 5.  She has been treated for psychotic symptoms and mood disorders and has been diagnosed as bipolar.  Chris and Charlotte both drank excessively, used methamphetamine regularly, and resolved their disputes through domestic violence.  In 1982, Chris was convicted of selling half a gram of methamphetamine and was sentenced to probation.

Charlotte's pregnancy with Chase was unplanned, and she has acknowledged that she continued to drink alcohol throughout most of the pregnancy. Chase reported that his mother "admitted she never wanted me when she found out she was pregnant with me. She would try to drown me out with alcohol and drugs and beating her stomach." He also reported that his mother was not feeding him after he was born. He reported that his mother said he would not feed, and she felt like a failure, so she did not seek medical help until Chase lost weight and needed to be hospitalized. The hospital gave Charlotte formula, but nevertheless Chase related a story of a time his mom ran out of formula so she went to the store and gave Chase a bunch of chocolate milk, which made him sick. Charlotte's sister had to take her to get formula.

After Chase was born, the family moved to Broken Arrow, Oklahoma, where his father Chris was ultimately able to stop using drugs with his family's help. Chris and Charlotte separated soon after, and Charlotte moved back to Austin with Chase and his older sister, Crystal.

Charlotte was extremely abusive and neglectful to Chase and Crystal. She engaged in prostitution to support her drug addiction and was unable to provide for her children's basic needs. Chase and Crystal recall not having electricity or running water in their mother's home and were typically left unsupervised. They recall sitting in front of a fast food restaurant all day and begging for food. Chase also recalls eating out of a trashcan and that at times his mother made him steal. Crystal does not remember a full 24 hours where her mom was present. She was in charge of her little brother from the time that she was only 9 and he was 3.

Not only did Charlotte fail to provide for her children's basic needs, but she also subjected them to physical, psychological, and sexual abuse – at her own hands, and at the hands of strangers she allowed into their home. Crystal tearfully recalled "half-naked people, drunk and on drugs, who couldn't keep their hands to themselves." She recalled constantly feeling uncomfortable, and

trying to protect Chase by keeping them out of the home as much as possible.  At the age of 10, Crystal felt that she had to be a mother to four-year-old Chase.

Mr. Smothermon was molested by multiple adults, beginning at age 2.  He reported his first instance of sex at age 4 involving his mother's boyfriend and his mother.  Mr. Smothermon reported that he walked in on his mom having intercourse with her boyfriend, and she told him to come over and lay between them while they were having sex.  Mr. Smothermon recalled an instance during which his mother took Polaroid pictures of her boyfriend with his penis in Mr. Smothermon's mouth.  He also recalled that this boyfriend performed oral sex on him (Mr. Smothermon).  He stated that the boyfriend penetrated him sexually on one occasion, and Mr. Smothermon was crying and screaming, and then the boyfriend threw him into a cactus.

Mr. Smothermon's mother also sexually abused Mr. Smothermon during his early childhood.  He reported that she would frequently perform fellatio on him in the bathroom of their Austin apartment, and that there were instances when he would shower with his mother and she would forcefully pull his face into her crotch.  She continued sexually abusing him until he was 13 or 14.  Not only did Mr. Smothermon report this to Dr. Lisak, but the incest by his mother is also in the PSR.  According the Probation Officer who wrote the PSR, Mr. Smothermon disclosed the abuse to her when she interviewed him on February 21, 2020.

In addition to the sexual abuse, Mr. Smothermon endured physical violence and abuse at the hands of his mother's boyfriend.  He repeatedly assaulted Mr. Smothermon's mother in front of her children, and also beat Mr. Smothermon with a homemade bull whip made out of electrical tape, which Mr. Smothermon has had nightmares and flashbacks about.  On one occasion, after Mr. Smothermon had urinated in his sleep, this boyfriend ripped Mr. Smothermon's underwear off and shoved them in his mouth, beat him with the bullwhip, and forced him to wear girls' underwear

afterwards.   Mr. Smothermon's mother began growing his hair out, purchasing him girls' underwear, and calling him "my second little girl."

Mr. Smothermon's mother introduced him to alcohol at the age of 5 or 6, when she got him drunk  during one of their sexual encounters.  She introduced him to methamphetamine when he was 13.  He had to get his stomach pumped for alcohol poisoning at 13.

Mr. Smothermon also recalled that as a child, he kept "getting caught having sex with girls… as much as a kindergartener can have sex. They would find me in compromising positions with a young lady. Never anyone younger, always my own age or older, but that was a constant problem."

Despite the dire circumstances, there was no immediate intervention by a responsible adult. Mr. Smothermon's maternal grandmother even called his father, Chris Smothermon, a few months after Charlotte took the children to Austin, and told him the situation was dire, and that the children were being exposed to drinking, drugs, and male strangers who engaged in sex acts in front of the children.  Yet somehow Chris was not able to obtain custody of Chase and Crystal for another two years and the children remained in this terrifying existence.

Chris Smothermon recalled an instance when he had to go to Texas to get the children when he was notified that Crystal had been arrested as a juvenile for possession of narcotics and Charlotte was arrested for vagrancy.  Ultimately, he was able to get custody of the children, and he moved them back to Broken Arrow in 1992.

Chase's time at his father's house was characterized by his stepmother's cruelty.  Chris worked long hours, so Chase was primarily under the care of his stepmother, Tina, whom he described as "cold and psychologically abusive."  Crystal described her as "terrible, mean, and cruel."  Mr. Smothermon struggled with bed-wetting through the age of 13, and Tina would

intentionally humiliate him in front of his friends, calling him "Pee-body."  He was made to wear diapers until he was 13, which was humiliating, and he reported that Tina would bring pampers to school and give them to him in front of the whole class and say "here, this is in case Chase wets himself."  Mr. Smothermon reported that at the time, he felt he needed to be treated "like an animal, like a lower form of humanity."  Tina would often berate the children by telling them they were "trash" and were destined to wind up like their mother.

When Mr. Smothermon was in elementary school, he was diagnosed with various learning disabilities and became hyper-sexual.  A neighbor told Chris Smothermon that she found Chase undressed on top of a little girl, who was also partially clothed.  In response, Chris gave Chase a paddling and told him his actions were not "ok," but took no further actions.  Similarly, Chase's third grade teacher told Chris that Chase needed to be evaluated by a mental health provider for ADD and ADHD.  Chris took Chase took a therapist, but the therapist merely prescribed medication for ADHD and did not offer counseling or treatment services.  In Dr. Viljoen's 2020 Forensic Evaluation, Dr. Viljoen notes that children exposed to trauma frequently display emotional and impulsive responses, which are often mistaken as symptoms of ADHD.  Dr. Viljoen therefore concludes that the symptoms Mr. Smothermon may have been displaying at the time–such as irritability, distractibility, impulsivity, and defiance–are better understood as trauma responses than ADHD symptoms.

One day, after Tina removed the door to Crystal's bedroom as a form of discipline, Crystal could not stand to be around Tina anymore and decided she would rather live with her sexually abusive mother.  Crystal went to go live with Charlotte, leaving Chase behind in Broken Arrow. When Chase visited Crystal and Charlotte, Charlotte provided him with alcohol and methamphetamine.  On one occasion, when Chase visited at the age of 13, he reported that his

mother tried to prostitute him out and made him drink bleach in case he was drug tested.  On that same visit, he reported that his mom's boyfriend was beating her and Chase tried to fight him, and the boyfriend got his gun and began shooting off shots.  On one occasion, he reports that he woke up after being high on methamphetamine and his penis was inside of his mother, but when he said something, she threw him off and made it seem like he had done it, although he was asleep.

By age 13, Mr. Smothermon began avoiding both his mother's abusive household in Texas and his father's home in Oklahoma.  As a result, he became intermittently transient at age 13, and at age 14 he began hanging out with the "wrong crowd," drinking alcohol, and cutting class.  As a teenager, Mr. Smothermon also struggled with depression, anger management, post-traumatic stress disorder (PTSD), violent outbursts, and thoughts of suicide.  During this time, Mr. Smothermon began committing burglaries of neighborhood homes and cars so that he could obtain a "thrill."  When Mr. Smothermon was 14 he stopped going to school all together and Tina stated he was no longer welcome in her home, at which point he became homeless.

Around age 15, Mr. Smothermon briefly lived with Crystal's father-in-law, who Mr. Smothermon reported sexually abused him and demanded sexual favors in return for Mr. Smothermon living with him.  When Mr. Smothermon was 17, he was referred to Oklahoma Child Welfare Services after he disclosed that when he was 15, his sister's father-in-law, "Uncle Stan," sexually abused him.  Mr. Smothermon reported that while he lived with Uncle Stan, Mr. Smothermon and Uncle Stan would have sexual relations with various girls, ages 14-15, which would be videotaped.  During this time, Mr. Smothermon continued to experience thoughts of suicide, and he coped with these thoughts by using morphine and hydrocodone pills and smoking marijuana daily.

Mr. Smothermon later reported during his Forensic Evaluation with Dr. Viljoen that "Uncle Stan" forced himself on Mr. Smothermon, forced Mr. Smothermon to perform oral sex on him, became violent with him, beat him, continually forced Mr. Smothermon to have sex with him and video-taped it, and penetrated him and a girl named Amanda.  However, the Evaluation indicates that in a report from the State of Oklahoma Department of Human Services, Mr. Smothermon reported a sexual abuse allegation against Uncle Stan, in which he reported that he, Uncle Stan, and his (Mr. Smothermon's) girlfriends would have sexual relationships that would be video-taped–but that Mr. Smothermon denied direct sexual contact with Uncle Stan.

At 15, Mr. Smothermon left Uncle Stan's house and returned to live with his mother in a homeless encampment in Austin, Texas.  His mother earned money to support herself and her drug addiction by prostitution, and she required Mr. Smothermon to stand outside her tent or van while she engaged in sex work.  During this time, Mr. Smothermon recalls sleeping outside on a picnic table and his mother providing him with methamphetamine.  Mr. Smothermon began to stay awake for days at a time because he feared the night terrors that came when he slept.

When Mr. Smothermon was living with his father in Broken Arrow in 2004 at age 16, the Oklahoma Department of Human Services received a report that Mr. Smothermon was "out of control," was threatening to kill his parents, and was in a sexual relationship with a 34-year-old woman.  Mr. Smothermon was committed to a Youth Habilitation Center.  While there, he told Reverend Rollins about his history of childhood sexual abuse.

When Mr. Smothermon was released, he went to Carlsbad, New Mexico to live with his mother and her sister.  The day after Christmas in 2005, Charlotte punched Mr. Smothermon in the face because he had not given her money she needed to pay a debt.  Following the fight, Mr. Smothermon left his aunt's home.  A few days later, on New Year's Eve, Mr. Smothermon was

charged with a felony auto-burglary.  Mr. Smothermon explains that he was cold, homeless, and drunk when he broke into a vehicle to get warm and sleep for the night, and he also stole some items inside the vehicle, damaged the stereo, and armed himself with a knife he found inside the truck.

A month later, Dr. Will Parsons evaluated Mr. Smothermon to determine if he was competent to stand trial.  Dr. Parsons concluded that Mr. Smothermon was not competent to stand trial because he suffered from an anxiety disorder, schizophrenia, schizo-affected disorder, and a personality disorder.  Five months later, Mr. Smothermon pled guilty to auto burglary.  He was incarcerated in the New Mexico Department of Corrections after violating the conditions of his probation and served almost four years in prison.  It was during this period of incarceration that he met and became friends with Mitchell Overhand, and also became addicted to heroin.  Following his release from custody, he was paroled to a family friend in Roswell, but violated his conditions of supervision and was re-incarcerated.  When he was released in 2011, he relocated to Albuquerque.

Mr. Smothermon became involved with the Legacy Church of Albuquerque, where his paternal uncle was the pastor.  Mr. Smothermon threw himself into the life of the church and remained happy, productive, and drug-free for two years.  He was initially employed as a janitor at the church, but quickly became a youth pastor and a member of the choir.  He was married on December 8, 2012 to Ana Rodriguez Robles.  He started his own landscaping business and enrolled in the Central New Mexico Community College.

However, the intrusive thoughts and PTSD crept back into Mr. Smothermon's life, and he relapsed on drugs.  He quit his job at Legacy Church, divorced his wife, stopped attending church, and began to use large amounts of drugs, as well as selling drugs, engaging in street fighting,

associating with drug addicts and prostitutes, and engaging in a series of polyamorous relationships.  Mr. Smothermon was deeply immersed in this lifestyle by August of 2017, when he committed the kidnappings of J.S. and M.T.

Mr. Smothermon has one daughter, Jaydian Marie Smothermon, age nine, from a previous relationship with Katie Gotscher.  Jaydian was exposed to alcohol and methamphetamine in utero but did not develop any health complications.  At age one, Jaydian was legally adopted by Mr. Smothermon's paternal aunt, Iris Smothermon.  However, Iris passed away in 2018 at age 63 from a rapid onset of cancer.  Jaydian has since been transferred into the care of Mr. Smothermon's cousin and his wife in Texas.  Mr. Smothermon has had intermittent contact with Jaydian throughout her lifetime.  However, Iris did not want to tell Jaydian about her biological parents, so when Mr. Smothermon had contact with Jaydian he was identified as a relative or close family friend.  Mr. Smothermon attempted to contact Jaydian for her birthday and holidays, but he ultimately began to keep his distance in order to respect his aunt's wishes.

Regarding his mental and emotional health, Mr. Smothermon was diagnosed with ADHD at age nine.  He also reported a diagnosis of PTSD based on the childhood abuse and neglect he endured.  He struggled with Enuresis (bed-wetting) through age 13.  He also reported being molested by multiple adult offenders during his early childhood, including his mother.

A court-ordered forensic psychological evaluation was completed in 2006, and concluded that Mr. Smothermon was not competent to stand trial at that time.  During the evaluation, Mr. Smothermon reported multiple psychiatric hospitalizations during his youth, and diagnoses of Bipolar Disorder, PTSD, ADHD, and anger issues.  Mr. Smothermon also described an alter ego named Bryan Adams that Mr. Smothermon would at times turn into, and described experiences hearing voices for the past year or two that tell him what to do.  The evaluation provided the

following diagnoses: polysubstance dependence, generalized anxiety disorder (with dissociative features), schizophreniform disorder, rule out schizophrenia (paranoid type), personality disorder (mixed features).  Mr. Smothermon reported experiencing nightmares and extreme anxiety.

During a clinical assessment conducted by the New Mexico Department of Corrections in 2008, Mr. Smothermon reported that he had attempted to commit suicide many times, but only a few of them were "serious."  The first time was at age 11, when he started remembering the sexual abuse he had endured as a young child.  He reported that he tried to hang himself, but his father found him.  He also reported that he has self-mutilated in the past.  He reported extreme anxiety, including feeling that something is pushing hard on his chest, that he can't breathe, that there is pending danger, his heart racing, and being unable to speak without Seroquel.

Mr. Smothermon has been prescribed several psychotropic medications throughout his lifetime, but medical records from the Cibola County Correctional Center reflect that he is not currently taking any prescribed psychotropic medications.  During the Forensic Evaluation conducted by Dr. Viljoen, Mr. Smothermon reported periods of time where he feels euphoric without being on drugs that last from a few days to a couple weeks.  During these increased energy periods, he endorsed symptoms including very fast speech, racing thoughts, difficulty concentrating, increased sexual activity, making unwise business decisions, and "one unfinished project after another."  He also described reckless behavior including starting fights with "groups of people… trying to get taken out" and behavior including jumping out of two cars and running towards a car while drunk and high.

He reported general difficulty sleeping and nightmares about being molested and having "very horrible sexual dreams" for as long as he can remember.

Mr. Smothermon described times when he is not himself, can be "foaming, frothing at the mouth" and doesn't remember periods of time.  He reported that he feels unreal or outside of himself a lot.  Mr. Smothermon described seeing a "blinding white circle" in front of him, and he reported that individuals including Stan and Mariah Ferry have told him that when he gets into a rage, he would yell or scream about the circle, completing the circle, and "the music."  He also reports that when he is angry sometimes, he hears "thunderclouds, almost like a symphony" and he feels powerless and helpless to do anything about it.  Mr. Smothermon reported that the only things that will get rid of the sounds are violent sex, working out, and God.

Mr. Smothermon reported that when he gets in a depressed or suicidal mode, he doesn't feel good unless someone lays hands on him.  He also reported body dysmorphic issues concerning his genitals.  He reported an inferiority complex regarding the size of his penis and stated, "it became an obsession that it was too small."  He stated this concern is linked to his mother making him wear girls' underwear and telling him, "If you were a real boy you wouldn't be able to wear those."  He stated that he sought out Cheriee Allaway to fill the role of humiliating him and dominating him during sex.  He also reported an ongoing history of suicidal ideation, including drinking nightly by himself with a gun on the table, trying to get himself "to do it."

Dr. Viljoen's initial diagnostic impressions were as follows: Borderline Personality Disorder; Compulsive Sexual Behavior Disorder and Body Dysmorphic Disorder, with Good Insight; PTSD with Dissociative Symptoms; Substance/Medication-Induced Bipolar and Related Disorder, By History; Body Dysmorphic Disorder, With Good Insight; Other Hallucinogen Use Disorder (MDMA, LSD, and psilocybin mushrooms), Severe, In a Controlled Environment; Other (or Unknown) Substance Use Disorder (Bath Salts), Severe, In a Controlled Environment; Alcohol Use Disorder, Unspecified, In a Controlled Environment; Cannabis Use Disorder, Severe, In a

Controlled Environment; and Stimulant Use Disorder, Amphetamine Type, Moderate, In a Controlled Environment.

However, in her testimony during the sentencing hearing, Dr. Viljoen explained that she had changed her diagnosis of Borderline Personality Disorder subsequent to completing her report, after she reviewed additional materials and spoke with Mr. Smothermon again (for the fourth time). She changed her diagnosis to a Specified Personality Disorder with Borderline and Antisocial Traits. She explained that a specified personality disorder results when you combine two personality traits to form one diagnosis. Characteristics of Borderline Personality Disorder include having unstable relationships and maladaptive coping–it tends to be more self-destructive, but can also be destructive towards others. Antisocial personality disorder is characterized by a lack of regard for social norms, engaging in criminal behavior, impulsivity, lack of remorse, being indifferent to or rationalizing having hurt, mistreated, or stolen from another person–and tends to be more destructive towards others. Borderline Personality Disorder and Antisocial Personality Disorder also have overlapping traits, including anger, aggression, impulsivity, manipulation, and deceitfulness.

Regarding the diagnosis of PTSD with Dissociative Symptoms, Dr. Viljoen states in her report that Mr. Smothermon "endorsed multiple traumatic experiences, including childhood physical and sexual abuse; witnessing domestic violence; other unwanted or uncomfortable sexual experience; transportation accident, physical assault, assault with a weapon; serious injury, harm, or death caused to someone else by himself; witnessing sudden violent death; and witnessing sudden accidental death. He also endorsed symptoms including intrusion symptoms, persistent avoidance of stimuli associated with the trauma, negative alterations in cognition and mood that

are associated with the traumatic event, alterations in arousal and reactivity associated with the traumatic event, and dissociative symptoms."

Regarding the diagnosis of Substance/Medication-Induced Bipolar and Related Disorder, By History, Dr. Viljoen notes that symptoms relating to manic or hypomanic episodes appear to occur within the context of significant substance abuse, and it is notable that Mr. Smothermon has not experienced any manic episodes while incarcerated despite not taking any mood stabilizing medications.

Mr. Smothermon also reported an extensive drug abuse history beginning in early childhood.  His mother introduced him to alcohol when he was a very young child–various sources report under the age of 10 and under the age of 5.  He had alcohol poisoning at age 13.  He also began using marijuana and methamphetamine at a young age.  Sources are inconsistent about the exact age, reflecting that he began using marijuana at some point between ages 10 and 16.  It was his mother who introduced him to methamphetamine, and he recalled injecting his mother with methamphetamine at her instruction.  He reported that his last use of methamphetamine was on the night of the kidnapping.  Mr. Smothermon also began to use crack cocaine around age 12 or 13 with his mother.  He reported that his last use of cocaine was when he went to prison.

Although Mr. Smothermon received substance abuse treatment as a juvenile, he always returned to drug use.  Mr. Smothermon reports ongoing methamphetamine and crack cocaine use throughout his formative years until his adult incarceration.  He reported a belief that his extensive drug use "warped" his mind."  He also reports that he developed a heroin addiction when he was incarcerated in the New Mexico Department of Corrections; that he used heroin consistently while in custody; and that when he was discharged, he had developed an addiction to heroin which required spiritual treatment for him to overcome.  During his evaluation with Dr. Viljoen, he

reported that he was prescribed opiate pain pills when he was 13 or 14 after a car accident and eventually started to abuse those, buying 8 or 9 morphine tablets a day for most of his childhood. He also reported that he was prescribed Klonopin and Valium at age 13, and also reported abusing those prescriptions until age 20 or 21, always in conjunction with alcohol.  He reported that he last used heroin when he was 20 years old and pain pills around age 20 or 21, but he has used Suboxone four times since being incarcerated, as recently as September of 2019.

Mr. Smothermon also reported to Dr. Viljoen that he has a serious problem with inhalant use between the ages of 13 and 20 or 21; that he experimented with PCP when he was younger and used LSD and psychedelic mushrooms "for years;" that he began using bath salts sometime in 2016, which was when his life "took a real downward departure;" that he used ecstasy daily for the two years before his arrest on the kidnapping charges; and that he used ketamine "when he could find it."

During Mr. Smothermon's 2006 psychological evaluation, he reported heavy substance abuse of marijuana, methamphetamine, PCP, LSD, and psychedelic mushrooms.  He reported his drugs of choice are "speed or hallucinogenics."  His New Mexico Department of Corrections initial assessment dated January 2008 reflects: "Inmate started drinking at the age of 6 when his mother got him drunk.  He states marijuana is his drug of choice.  He also states he has used everything; acid, mushrooms, PCP, cocaine, and heroin.  He says he uses whatever is in front of him…. He states he only drinks once a month, but that he binges when he is depressed."  Mr. Smothermon told Dr. Viljoen that his drugs of choice are "weed and hallucinogens and DMT because it takes you way out to a different reality."

When Mr. Smothermon became involved with a church in Albuquerque in approximately 2011, he maintained nearly four years of abstinence from drugs and alcohol, his longest period of

sobriety.  However, his relapse in 2015 led to an immediate and dramatic decline.  In the two years preceding the instant offense, the Mr. Smothermon reported using MDMA, ketamine, methamphetamine, mushrooms, and marijuana on a daily basis, in addition to oxycodone and prescription narcotics.   After not sleeping for several days, Mr. Smothermon would often experience hallucinations.

At the time of the kidnapping offense, Mr. Smothermon reports being under the influence of drugs and having not slept in several days.  He also reported that in the six months leading up to the offense, he had reduced his drinking, but in the six months prior to that, "it was malicious drinking just to get black out drunk," and he would start the day with "10 mini shooters or a fifth" and by the end of the day he would be on his third fifth.  He stated he could not function without a beer and had to have a beer or shots in the shower.

Regarding his educational history, Mr. Smothermon dropped out of high school in Broken Arrow in the 9th grade.  His failure to pass the 9th grade coincided with beginning to get in trouble for possession of marijuana and his abusive home life, which impacted his academics.  Mr. Smothermon stated that during this time, he "was eating massive amounts of pills" and "was on a suicide mission."

Mr. Smothermon obtained a GED in 2008 while incarcerated in the New Mexico Department of Corrections.  During his period of sobriety, Mr. Smothermon attended Central New Mexico Community College from 2012 through 2014, working towards an associate degree.  Mr. Smothermon also reported that he is a second-degree black belt in Taekwondo.

Regarding employment history, Mr. Smothermon was employed as a maintenance laborer for Legacy Church from 2011-2013.  He left this job in order to start his own landscaping business. From 2014 through 2017, Mr. Smothermon was self-employed performing landscaping and

maintenance labor.   Mr. Smothermon also reported a sporadic employment history in the restaurant, fast food, and construction industries.

In addition to formal employment, Mr. Smothermon reported extensive volunteerism at Legacy Church between 2011 and 2016.  He participated in the church praise and worship team, youth ministry, various bible study groups and NA/AA groups.  He organized special events and rape prevention seminars, coached special Olympics participants, and coordinated Make-A-Wish foundation donations.  His involvement declined in 2016 after his divorce and after his substance abuse relapse and estrangement from his daughter. Mr. Smothermon provided significant donations to Legacy Church, including over $5,000 in 2013, and over $10,000 in 2015.

At present, Mr. Smothermon's mother, Charlotte, currently resides in Clovis, New Mexico. Mr. Smothermon and his sister have not had contact with her in several years.  Mr. Smothermon told Dr. Viljoen that this is because his mother does not want to talk to him.  Mr. Smothermon reported, "I tried to have a relationship with her.  I would make the effort to go visit her.  I had to prepare myself; she would get really, really mad.  I would go months without talking to her, then she would Facebook message me. It brought up painful memories… I tried to talk to her and it never ended well. She would just beat on me. She was a very violent person."

Mr. Smothermon's father, Chris Smothermon, currently resides in Broken Arrow, Oklahoma, with his wife, Tina.  Mr. Smothermon stated that he and his father have a good relationship, and his father is one of his best friends.  He stated that he is nice and respectful towards his stepmother, which he does for his dad.

Mr. Smothermon has a maternal half-brother and two paternal stepsisters, with whom he has limited contact.  His older sister, Crystal, now resides in Norman, Oklahoma, and works in the hemp industry.  He speaks with her every week.

Mr. Smothermon's father and sister describe him as kind, considerate, motivated, ambitious, hard-working, and talented.  Upon his release from custody, Mr. Smothermon would like to either return to Albuquerque or reside with Crystal in Oklahoma.  Crystal expressed unconditional support for Mr. Smothermon and is willing to assist him upon his release from custody.

It is very telling that neither parent is here to support their son, even now.[3]  The Court finds this consistent with Crystal and Chase's statements about their parents' failure to be present as parents in their lives when they needed them most.

Mr. Smothermon has a future aspiration of working in the Christian Ministry.  While incarcerated, he has been actively involved in religious activities, including organizing and leading Bible study groups.  He also described advocating with the facility administration for implementation of chapel services, an inmate "pay-it-forward" program, requesting 12-step program resources for inmates, and other related endeavors.  Mr. Smothermon plans to continue his efforts to promote spiritual activities and opportunities for inmates once placed in the Bureau of Prisons (BOP). The PSR-writer contacted the executive administration at the Cibola County Correctional Center, which confirmed Mr. Smothermon leads a weekly Bible study group.  He attempted to organize a program to donate inmate crafts to the Make-A-Wish Foundation, but this project was denied.  Mr. Smothermon has also made several requests for religious reading material and curriculum which have been denied due to security risks.

Mr. Smothermon submitted numerous character letters to the Court.  They are written by friends from church, family, and inmates that Mr. Smothermon has known for the past few years

---

[3] This statement refers to the fact that neither of Mr. Smothermon's parents were present at his sentencing hearing.

at Cibola County.   The letters describe Mr. Smothermon as selfless and hard-working.   In particular:

- Pastor Steve Smothermon (Mr. Smothermon's uncle) writes that when Chase came to live in Albuquerque, Pastor Smothermon hired him to work at the church.   He writes that Chase worked hard and showed up on time, and that he also did very well in his lawn-care business.   He writes that "Chase has had a life that would have driven even the greatest person to the extreme."   Pastor Smothermon observes a "tragic trend" in Chase's life: "When Chase was given grace, he did the right things; yet when he was among harmful influences and examples, he would return to a dark place."   In his best days, with the church, he had a passionate and joyful heart and was generous with his time, understanding, and heart.   "Yet taking that generosity overboard, it was difficult for him to stay away from the people who would harm and influence him wrongly."   Pastor Smothermon believes that Chase's slide into crime was caused by his "naïve passion for helping others at all cost to himself led him to hire ex-cons to come work for him."   He concludes that Chase was unable to overcome the tragedy that defined his childhood, and that he loved to help people but could not help himself.   He believes Chase can change and repent for what he has done.   The Court notes that Pastor Smothermon was also not present for Mr. Smothermon at his sentencing.

- Adrian Zamora (Mr. Smothermon's best friend) met Mr. Smothermon through church and describes him as a hard worker, kind, generous, and selfless, volunteering extensively at church.   He describes how Mr. Smothermon's separation from his wife caused a lot of turmoil within the church as they were both very active in it, and Mr. Smothermon drifted away at that time and relied on finding comfort elsewhere with the wrong people.   He believes that the stress and pressure from working 7 days a week, losing his wife, daughter, and sense of belonging in the church caused Chase to lose himself.

- Chris Smothermon (Mr. Smothermon's father) writes that he is proud of Chase to this day, and proud that Chase stands up and protects the less fortunate.   He also describes how Chase's Taekwondo teacher was killed in a car accident, and this took a big toll on Chase.   He and his wife Tina ask for leniency.

- James Gillum (a friend) describes Mr. Smothermon as kind-hearted and describes a time he bought flowers for a Walmart door greeter, making her so happy she cried.   He describes how Mr. Smothermon helped him personally by providing him work at his lawn care business.   He describes how Mr. Smothermon always thought of others before himself and was a good friend.

- Leroy Jimenez (another friend) describes Mr. Smothermon as a hard-working person who always had a soft spot for God.   He describes a time when Mr. Smothermon saw a homeless man in the street holding a sign that said "hungry," and Mr. Smothermon bought the man a meal and a cold drink–it was second nature to him.

- Matthew Kindle writes that he has known Mr. Smothermon for over six years, including employing Mr. Smothermon as a sub-contractor for two years.   He states that Mr. Smothermon

was his top performer with an excellent work ethic and self-driven attitude who completed all work assigned to him.  He also writes that shortly after Mr. Smothermon's arrest, Mr. Smothermon asked him to be his spiritual advisor, and Mr. Smothermon has responded well to ministry and has never wavered in his desire to redeem his life.

- Multiple inmates describe how Mr. Smothermon has helped them find religion and state that he is their "brother in Christ," is a spiritual inspiration, and has helped them learn that life is worth living.  For example, Angel Godinez describes Mr. Smothermon as having helped him stay away from his depression and suicide, and how to do better in life.  Rode Enjady writes that when he was first incarcerated at Cibola in 2019, Mr. Smothermon approached him with a warm, caring welcome and invited him to attend bible studies.  He writes that Mr. Smothermon's attitude and actions are all positive and he has a special ability to express his love for God.  Others write that Mr. Smothermon provided necessities which they could not afford when first arrested.  Still others who had never been religious describe how Mr. Smothermon helped them not give up hope and turn to god.

In considering the weight to assign to these character letters, the Court has also considered evidence of Mr. Smothermon's conduct while incarcerated, provided by the government.  Mr. Smothermon was found to have handcuff keys inside his person while incarcerated at the Metropolitan Detention Center in October of 2017.  He admitted during a jail call that he found the handcuff key in court and he took it and put it in his rectum.  Mr. Smothermon now objects that he was falsely accused of possessing the handcuff key–an objection which the Court has overruled in its written order.  Mr. Smothermon also admitted in his August 20, 2020 interview with Dr. Viljoen that he did in fact have the handcuff key.  Next, in August of 2018, Mr. Smothermon had an altercation with Cibola's Chaplain, during which Mr. Smothermon raised his voice, used profanity, and tensed up with his fists clenched, stating "get away or I will give you some of this."  Additionally, in a handwritten note seized from Mr. Smothermon's cell in September of 2017, Mr. Smothermon wrote, "suboxin in Bible – Damn I wish I had that Bible." These incidents do demonstrate that Mr. Smothermon continues to struggle.

**With respect to the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to promote**

**public safety:** The instant offense involved deeply violent and abhorrent acts, and led to the tragic death of J.S.  J.S.'s family learned of the murder from M.T., who contacted them hysterically upon being released from being kidnapped. The family encouraged M.T. to go to the police.  They then anxiously waited several weeks before J.S.'s mother assisted law enforcement in finding J.S.'s body on the mesa using his cellular phone GPS data.

J.S.'s parents described their experiences having to listen to defense teams and the media "assassinate J.S.'s character."  They spoke of the "sad reality" that because J.S. has a history of substance abuse, his murder has been minimized.

J.S.'s family remembers him as an extremely talented violinist. At his funeral, approximately 250 people packed into an Albuquerque church and the service went on for several hours with friends and family recalling their fond memories of him.

J.S. leaves behind a son, D.S., age 21, who was devastated to learn of his father's gruesome murder.  The news sent D.S. into a downward spiral for nearly two years, as he struggled to cope with the details of his father's death.  The family is saddened that D.S. was "robbed of his father." Fortunately, D.S. is finally moving forward and has recently begun a successful career outside of New Mexico.

According to J.S.'s mother, J.S. had been working for Mr. Smothermon intermittently as Mr. Smothermon had a landscaping business.  J.S.'s son, D.S., had been introduced to Mr. Smothermon as well.  J.S.'s mother believes that Mr. Smothermon had begun recruiting D.S. and his high school friends to assist him with growing and distributing marijuana. J.S. became concerned about Mr. Smothermon's influence on D.S. and was dissuading D.S. from associating with him.  Following J.S.'s murder, the family became so concerned about D.S.'s safety that they sent him out of state for several weeks until Mr. Smothermon was arrested.

Counsel for the government and J.S.'s family both attest that M.T. has been seriously traumatized by the instant offense.  The government also represents that M.T. has outstanding medical debts as a result of the offense.  M.T. described his remaining injuries in testimony from March of 2018, stating: "Certainly can't walk right. My head is certainly screwed the f*** up."

M.T. also provided a statement to SA Leysha Lopez-Recci on June 25, 2020.  In that statement, he described the crime and its impacts as "the kidnapping torture and psychological trauma I had to go through and will probably always be going through."  He wrote, "I am or was a strong man skilled mechanic and certified millworker, now I'm unable to work in either trade due to the fact I spend 3 to 4 days a week hiding in my room or driving around town in a panic screaming at whoever is around me that I'm being followed or someone is trying to kill me so I spend over half my time and [sic] pure fear and that is due to Miss Ferry's love is [sic] torture."  He characterizes Ms. Ferry as "the most twisted and evil one of Satan's Little Helpers" and states that in his opinion, Ms. Ferry should have been the one to get the most time.

M.T. continues, "The world lost a beautiful person and broke another Beyond repair on the day Chase and Mariah decided to play God."  He concludes that J.S. "did nothing to them and didn't deserve to die a gruesome death to further their fantasies.  I also did nothing to deserve a lifetime of mental health issues."

Regarding the need to promote public safety, the Court is also concerned about Mr. Smothermon's propensity towards violence.  As the government points out, several instances demonstrate such a propensity, including:

- Mr. Smothermon had a "to do" list, which contains the statement "Shoot Mariah's Ex-Boyfriend;"

- Mr. Torrez reported that Mr. Smothermon asked Mr. Torrez if he (Smothermon) should kill J.S.;

- Mr. Smothermon physically assaulted Mariah Ferry on at least one occasion, resulting in Ms. Ferry driving herself to the emergency room and reporting that she was "kicked and punched, and hospital records reflect that Ferry had bruises all over her body, bilateral black eyes, left eye swollen shut, and had "battle signs;"

- On February 14, 2017, APD received a call from a counselor with the Digital Arts and Technology Academy because 16-year-old D.S. had come to school with a black eye given to her by her 29-year-old boyfriend, Mr. Smothermon.  The school counselor stated that D.S. had been staying with Mr. Smothermon at his residence and that he had "made threats to other students that if D.S. leaves him he was going to put them in a metal box."  As D.S. was uncooperative, no charges were filed.

- About a week later, on February 23, 2017, Mr. Smothermon was arrested for drug possession, contributing to delinquency of a minor, and possession of handgun after a road rage incident.  D.S. was Mr. Smothermon's passenger.  An eye-witness reported that Mr. Smothermon drove his truck onto a curb, exited the truck, pointed a revolver-style firearm at the other vehicle and fired two shots in slow succession, then got back into his truck and pursued the vehicle down Central Avenue where the two vehicles collided.  Another eyewitness (whom officers described as heavily intoxicated) reported that Mr. Smothermon approached him after the crash, threatened him with the firearm, and then the two got into a physical fight.  After the fight, the eyewitness said he thought he saw Mr. Smothermon give the firearm to D.S. before police arrived.  Mr. Smothermon was taken to the hospital where he threatened medical staff during the visit.

- On April 26, 2017, Mr. Smothermon messaged a woman, stating: "So, so… just broke as hell from you and everyone else not keeping there [sic] word and paying me.  Shot someone a few days ago and launched another guy from a 2 story balcony… fucker broke his neck… lol… I made national news headlines (new York times) a few weeks ago… stressed really."

**With respect to deterrence:** Mr. Smothermon has a criminal history dating back to when he was a juvenile.  He disclosed a history of contact with the juvenile justice system in Oklahoma involving marijuana possession and theft.  His father confirmed the information, but records of his juvenile history were no longer available.  However, the 2006 Clinical Assessment completed by the New Mexico Department of Correction indicates that when Mr. Smothermon was 15, he was in juvenile custody in Oklahoma for holding a police officer hostage while his oldest daughter's mother robbed the house.

41

Mr. Smothermon's first adult conviction was for a 2006 Aggravated Burglary and related charges when he was 18.  This conviction resulted from an incident in which officers stopped Mr. Smothermon in response to a report of an automobile burglary in progress.  Mr. Smothermon gave a false name (Bryan Adams), was in possession of two large knives, and fled on foot.  He was detained after a foot pursuit, and officers determined that he did not have permission to be in the vehicle.  Mr. Smothermon admitted to taking the vehicle because he wanted the stereo and using the two knives to break into a lock box in the vehicle.  He also admitted to being a drug user and said that he had taken several prescription medications. The psychological evaluation conducted after Mr. Smothermon's arrest indicates that Mr. Smothermon asserted he did not recall the events leading to these charges, and that he believed one possible reason he did not recall is that he had been taken over by another personality, "Bryan."

Two years later, at age 20, Mr. Smothermon was convicted of Evading after he fled from officers on foot. The officers had approached him after they received information that Mr. Smothermon was taking financial advantage of an individual who had been assisting Mr. Smothermon with his court costs.

Additionally, in February of 2017, Mr. Smothermon was detained pending an investigation after a traffic stop in which he and Cheriee Allaway were in a vehicle and officers observed a large amount of marijuana in separate plastic baggies inside the vehicle.  A final list of items located inside the vehicle included 46 gross grams of mushrooms, 16 pills of an unknown substance, a black scale, an S&W M&P .380 caliber handgun, a box of .380 caliber bullets, and 466 gross grams of marijuana.  Mr. Smothermon was not charged.

Mr. Smothermon has been charged in five traffic offenses between 2012 and 2017 and was charged with Driving While Intoxicated in 2017.  The driving while intoxicated charge is still

pending: a warrant was issued after Mr. Smothermon did not appear for his August 29, 2017 court date.

Finally, Mr. Smothermon was charged in state cases that were ultimately not prosecuted due to his federal prosecution in the instant offense. One case that was dismissed was a case from February of 2017, in which Mr. Smothermon was charged with Contributing to the Delinquency of a Minor and Possession of a Firearm or Destructive Device by a Felon. This was the case in which D.S. was the passenger, which the Court has already described.

**With respect to rehabilitation:** The Court has heard testimony from two experts regarding Mr. Smothermon's prognosis for rehabilitation. Dr. Lisak, a clinical psychologist with an expertise on the impact of childhood sexual abuse on male victims, testified about the harmful effects of childhood sexual abuse on individuals, particularly boys and men. Long-term harmful effects include a core traumatic reaction, internalization of the abuse (which affects sense of self-worth), and impact on trust and ability to form intimate relationships. He further testified that there are ways in which boys who are sexually abused are harmed differently than girls. Sexual abuse renders boys vulnerable and powerless, which is in profound conflict with socialization of boys: they are expected to be strong and tough, never weak and vulnerable. This leads to feelings of uselessness, worthlessness, compensatory behavior, and being more likely to get involved in substance abuse. He also testified that boys are very reluctant to disclose abuse, and minimization is very common when they do disclose. Men who were abused as boys often don't disclose until 30s, 40s, 50s, and later. When they do, it is often in bits and pieces.

Dr. Viljoen, an expert witness in the area of forensic psychology, not only testified during this hearing but also prepared a Confidential Forensic Evaluation Report which the Court has reviewed. When Dr. Viljoen asked how the childhood sexual abuse affected him, Mr. Smothermon

stated, "I think a better question to ask is how it didn't affect me.  It touched every part of my life.

I thought I was an animal… I was born and made to be hurt and abused.  I didn't have any thought

that I was meant to be loved, that I was meant to have happiness… thought I had done something

wrong and that I deserved to be treated like that."  Mr. Smothermon also expressed to Dr. Viljoen

that he has "thought about trying to find a way to castrate myself."  He expressed feeling "dirty"

and feelings "bad for all the girls that I exposed them to things they wouldn't be in a normal

relationship."  He recognized that "sex has been for me an unhealthy outlet."  He reflected that

"the more drugs and alcohol I did, the more I had a hard time differentiating the bedroom and real

life. I probably ended up domestic assaulting some people, like a chick asked me to beat her up in

the bedroom and then I would outside the bedroom, not a lot, but…"  He denied engaging in sexual

activity that was not consensual, denied having ever engaged in sexual activities with children or

animals, and denied arousal when he observed child or animal pornography.

He also expressed having "severe abandonment issues," and said "If a girl tries to break up

with me, I can't handle it. That's why I got good at breaking up with girls. So, they can't… It

would be easier for me to die or if they died than someone leaving me."

When asked about what he believes risk factors are for him engaging in criminal behaviors,

he stated drugs, alcohol, being away from God, being with the wrong woman, not being in

counseling, and not taking medications when he needs them.  To avoid this risk in the future, he

replied that he will "continue to surrender my life to God in the service of others."

Mr. Smothermon expressed remorse about what he did to J.S., stating "What I did was so

bad.  Even if he did rob my house, I had no right.  I wake up thinking about this every day."  He

stated that he had a "break in reality for just a moment. A moment of weakness."  He described

how J.S. was wearing women's clothing on the night of the incident, and stated, "All the

feminization of my childhood was put on him… Transposing the things… this man was all the people that betrayed me; he was Stan, he was all those men that abused me.  It was like this fucked up cartoon situation like a fucked up dream like all the dreams I had… I don't know if it was Bryan or if it was me completing the circle of violence in my life or it was me on the ground, it was being done to me."  Mr. Smothermon expressed being ashamed of what he did, and reported that after the day he saw the video of the mutilation, "I never had sex with another person… I could not do it.  I was impotent for about a year.  I couldn't even masturbate.  Every time I did, I would think about that, even now.  I have to think about… like the ocean."

In her report, Dr. Viljoen stated that the Screening Version of the Psychopathy Check-List Revised was administered and Mr. Smothermon's score was "well below the cutoff for a diagnosis of psychopathy and did not fall in the range requiring further assessment of Psychopathic Personality Disorder."  However, in her in-court testimony, she stated that after she received additional information, it was necessary to score the full PCLR.  The scoring of the full PCLR revealed that Mr. Smothermon has a moderate amount of psychopathic traits but did not meet criteria for psychopathy.

In her summary and opinions, Dr. Viljoen explains that "male victims of sexual abuse that internalize a sense of betrayal by their female abuser have significant difficulties forming, maintaining, or functioning within adult relationships, have a deep distrust of women, and experience social isolation."  She opines that Mr. Smothermon believed for a long time that his only worth was as a sexual object, and so "in order to feel loved and valued, he became obsessed with sexual interactions."

Regarding treatment and prognosis, Dr. Viljoen notes that substance abuse disorders increase an individual's likelihood of engaging in criminal activity because substance use

undermines judgment, lowers inhibitions, and increases risk of engaging in impulsive or aggressive behaviors.  She explains that "treatment offers the best alternative for interrupting the criminal justice cycle for offenders with substance abuse and mental health problems.  Research has shown that treatment is effective and people can and do recover from addiction, maintaining abstinence. Research has also shown that as substance abuse declines, so does criminal behavior."

Regarding treatment of Borderline Personality Disorder (BPD) specifically, Dr. Viljoen emphasizes that research literature shows that the development of BPD is linked to genetic factors and adverse events during childhood, such as abuse.  Forty to seventy percent of patients with BPD reported a history of sexual abuse–which has led some clinicians to view BPD as a form of chronic PTSD.  Dissociation, a symptom that Mr. Smothermon exhibits, is a common feature of both BPD and PTSD associated with sexual trauma, especially in men that were sexually abused by their mothers.  Dr. Viljoen notes that "while personality disorders can be more challenging to treat and have a longer course, people who suffer from personality disorders are equally in need of and can benefit from appropriate treatment as those with other mental health conditions.  For example, Dialectical Behavioral Therapy is an empirically based treatment that has been found to be highly effective in treating trauma-based and emotionally dysregulated personality disorders such as BPD."

Dr. Viljoen concludes that Mr. Smothermon "presents with several protective factors that indicate he is very likely to benefit from trauma informed treatment aimed at addressing his compulsive behaviors and maladaptive coping strategies."  His strengths and protective factors include his motivation, good insight into his emotional and behavioral difficulties, desire for change, desire for a "regular sex life," positive attitude towards the possibility of personal change, desire to continue his education in the areas of psychology and divinity, successful history of self-

employment, and global intellectual functioning in the average range–meaning he possesses the necessary cognitive abilities to benefit from any treatment modality.  Dr. Viljoen also notes that "promisingly, he reports having close and supportive connections with friends and strong interest and motivation for treatment."

      Dr. Viljoen made extensive recommendations for treatment. Her recommendations will be made conditions of supervision and her report will be provided to treatment providers.

<b>CONCLUSION</b>

      After carefully considering all of the above factors, the Court sentenced Mr. Smothermon to 45 years of imprisonmendt in 18-CR-930, 20 years of imprisonment in 18-CR-931, and 10 years of imprisonment in 17-CR-2486, to run concurrently.  *See* Doc. 331 at 1 in 18-CR-930; Doc. 136 at 1 in 18-CR-931; and Doc. 80 at 1 in 17-CR-02486.  The criminal judgments containing the Court's specific sentence on each count of conviction, as well as Mr. Smothermon's conditions of supervised release, will be forthcoming.

      Dated this 17th day of September, 2020.

_____
MARTHA VAZQUEZ
UNITED STATES DISTRICT JUDGE